**Eric WALLER, as Personal Representative of the Estate of Doris Taylor, Deceased, Plaintiff–Appellee,**

v.

**David TRIPPETT, Defendant–Appellant.**

No. 01–2716.

United States Court of Appeals, Sixth Circuit.

Oct. 10, 2002.

46

Before KEITH and DAUGHTREY, Circuit Judges; CARR, District Judge.*

PER CURIAM.

Defendant–Appellant, David Trippett ("Trippett" or the "Defendant"), appeals the district court's order denying in part, and granting in part, his motion to dismiss Plaintiff–Appellee, Eric Waller's ("Waller" or the "Plaintiff") complaint for failure to state a claim pursuant to 42 U.S.C. § 1983 and on the grounds of qualified immunity.

For the reasons set forth below, we **AFFIRM** the district court's order denying the Defendant's motion to dismiss for failure to state a § 1983 claim and **REVERSE** the district court's order denying the Defendant's motion to dismiss on the grounds of qualified immunity.

## I.  BACKGROUND

This is an appeal from an action for damages pursuant to 42 U.S.C. § 1983 by the estate of a prison employee who was murdered by a prison inmate. The Plaintiff, acting in his capacity as the personal representative of the Estate of Doris Taylor ("Ms. Taylor" or the "decedent"), charged the Defendant, warden of Thumbs Correctional Facility ("TCF") in Michigan, of violating the decedent's constitutional due process rights because the Defendant

---

* The Honorable James G. Carr, United States District Court for the Northern District of Ohio, sitting by designation.

established certain prison policies and procedures that put the decedent at a serious risk of serious harm.

At the time of her death in May 1998, Ms. Taylor was working as a food service steward at TCF, where she had been employed for more than ten years. TCF is currently a prison facility for male offenders between the ages of 17 and 21 that are classified as Security Level II prison inmates.[1] Although TCF generally houses inmates who have committed Level II offenses, at the time of Ms. Taylor's murder, TCF also contained persons whose crimes warranted a Level III or IV classification. During all of the times that are relevant to this controversy, TCF was under the direction of the Defendant, Trippett, who served as its warden and, as such, was Taylor's ultimate supervisor.

On May 17, 1998, Gerald Barnes ("Barnes") and other inmates were assigned to routine kitchen duties at TCF. Barnes had been imprisoned after having been convicted of committing a criminal sexual assault with a knife. The complaint alleges that Barnes had a "history of admitting to at least eight rapes, several of which were committed at knife point." See J.A. at 11, Complaint at ¶ 23(*o*). Ms. Taylor had worked with Barnes before the attack and the complaint alleges that she had advised her supervisors[2] prior to the attack that Barnes should not be allowed near her.

The complaint alleges that pursuant to the policies promulgated by the Defendant, prisoner inmates working on kitchen details were allowed access to knives that where neither tethered nor secured in any manner. According to the complaint, in connection with its inmate kitchen detail program, the prison "[f]ailed to conduct any meaningful investigation of the prisoners to whom large knives were provided [in order] to assess their mental stability and/or propensity for committing additional violent acts." See J.A. at 8, Complaint at ¶ 19(b).

On the fateful day, Barnes checked out a large knife. When Ms. Taylor left the cooking area and went to the back offices, Barnes followed her and then, with the knife, violently stabbed her. Ms. Taylor died several hours later. In addition to the other practices and procedures, the Plaintiff's complaint also alleges that the Defendant furthered increased decedent's risk of substantial harm because he deviated from Michigan Department of Correction's policy when he declined to station correction officers within the kitchen food preparation area. See J.A. at 9, Complaint at ¶ 19(m). The Plaintiff also alleged prison inmates assigned to the food preparation area were inadequately supervised. See J.A. at 8, Complaint at ¶¶ 19 (d) & (k).

The Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P 12(b)(6) and on the grounds of qualified immunity. The district court issued an order granting in part, and denying in part, the Defendant's motion to dismiss. According to the district court, many of the Plaintiff's allegations failed to identify conduct that is conscience shocking in the constitutional sense. For example, opined the district

---

1. In Michigan, criminal offense levels are classified by prison authorities on the scale of one (I) through six (VI) with Level I covering the least egregious offenses and representing the lowest security risk and Level VI for the most egregious offenses and posing the highest security risk.

2. In this regard, the complaint simply states that the Defendant "[f]ail[ed] to heed the fears and advice of Doris Taylor that [Barnes] should not be allowed near her." See J.A. at 5, Complaint at ¶ 19(g). It does not identify whom Ms. Taylor told of her concerns about the prisoner.

court, citing to the Supreme Court's decision in *Collins v. City of Harker Heights, Tx.,* 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), and our decision in *Lewellen v. Metropolitan Gov't of Nashville,* 34 F.3d 345, 351 (6th Cir.1994), neither the state nor the Defendant had any constitutional duty in their capacities as Ms. Taylor's employers, to protect her from unreasonable existing risks. According to the district court, prisons are dangerous places, and the people who work in them are generally not entitled to receive any recovery if some unexceptional danger results in an injury, unless their exposure to risk was intended to be some form of punishment.

Similarly, concluded the district court, the state has broad authority in its determinations as to how to allocate resources. According to the district court, as Ms. Taylor became increasingly uncomfortable with general issues of prison overcrowding, the lack of security personnel, and the absence of electronic emergency transceivers, the burden was upon her to take reasonable steps to protect herself from harm. In sum, concluded the district court, Ms. Taylor's complaint regarding what amount to general employment risks are not actionable and thus subject to dismissal as the U.S. Constitution does not impose a duty on the state to provide employees with minimum levels of safety and security in the workplace.

Nonetheless, the district court declined to dismiss the Plaintiff's complaint in its entirety. The district court went on to conclude that although a generalized employment risk is insufficient to render a state liable for a constitutional due process violation, the affirmative creation of a particularized hazard or danger in relation to a discrete group of employees is a different matter. The district court believed that the Plaintiff had alleged facts sufficiently different from those in *Collins.*

Here, unlike in *Collins,* surmised the district court, Ms. Taylor was allegedly ordered to work under circumstances, which the supervisor knew or should have known would present a significant risk that she would be injured. As a result, the district court denied the Defendant's motion to dismiss the complaint in its entirety because accepting the allegations of the Plaintiff, in the most favorable light, the situation in the TCF kitchen on May 17, 1998 was compounded when the state indirectly armed a prison inmate with his choice weaponry without adequate supervision. The district court thus held that the state did something "to render an individual more vulnerable to danger." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir.1994). The district court stated that the Defendant presumptively made an intentional decision to institute a practice that provided an untethered knife without adequate supervision to a man who had a history of committing violent crimes with the aid of knives. The district court was persuaded that the Defendant ostensibly created a specific danger and, thereby, was deliberately indifferent to Ms. Taylor's constitutional rights.

Finally because the district court concluded that the complaint stated a cognizable claim for violation of Ms. Taylor's constitutional rights, the district court also addressed whether the Defendant was entitled to qualified immunity. The district court concluded that Defendant was not entitled to qualified immunity because the Defendant's conduct in promulgating policies which created a special danger to Ms. Taylor violated clearly established law. According to the district court, in this jurisdiction, the Constitution prevents an executive official from materially increasing the danger to which he renders other iden-

tifiable persons vulnerable. Therefrom, the district court concluded that a reasonable person, such as the Defendant in this case, should have been aware of these basic standards.

The Defendant timely appealed the district court's decision and order.

## II. ANALYSIS

### a. Dismissal For Failure to State a Claim

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) tests whether a claim has been adequately stated in the complaint. The basic requirements for a pleading are set out in Fed.R.Civ.P. 8(a) and call for a "short and plain statement of the claim showing that the pleader is entitled to relief." In considering a motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6), we must accept as true all factual allegations in the complaint. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984), and the motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ We agree with the district court that the complaint, read in the light most favorable to the plaintiff, supports a § 1983 claim. In order to establish a § 1983 claim, a plaintiff's complaint must allege facts which " demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law."[3] *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.) *cert. denied,* 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995) (quoting *Moore v. Tartler,* 986 F.2d 682, 685 (3d Cir.1993)); *see also Sargi v. Kent City Bd. of Educ.,* 70 F.3d 907, 910 (6th Cir.1995). Here, the Plaintiff's complaint alleges that the Defendant violated Ms. Taylor's substantive and procedural due process rights guaranteed by the Fourteenth Amendment.[4]

Generally a person does not have a constitutional right under the Fourteenth Amendment to be protected from the criminal acts of third parties. *See DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (stating that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors"). However, there are two recognized exceptions to this rule: (i) the special relationships doctrine; and (ii) the "state-created danger" theory. *DeShaney,* 489 U.S. at 199–200. A special relationship exists when the state assumes control over an individual sufficient to trig-

---

**3.** State action here is premised on the Defendant''s actions, in his individual capacity as warden of TCF, a Michigan state correctional facility, in promulgating, adopting or otherwise acquiescing to the offending TCF policies, practices and procedures contained in the Plaintiff's complaint.

**4.** We only address the merits of the Plaintiff's claim of substantive due process violation. Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal. *See, e.g,*

*Enertech Elec., Inc. v. Mahoning County Comm'rs,* 85 F.3d 257, 259 (6th Cir.1996). On appeal, the Plaintiff's notes in his brief that the complaint includes a statement that the Defendant violated Ms. Taylor's substantive *and* procedural due process rights. We note, however, that the merits of this appeal, as briefed by the parties, only addresses a substantive due process claim. Furthermore, the Plaintiff makes no attempt to explain or defend a procedural due process claim here on appeal.

ger an affirmative duty to provide protection to the individual (e.g. when the individual is a prison inmate or involuntary committed mental patient). *See id; see also Stemler v. City of Florence*, 126 F.3d 856, 867–68 (6th Cir.1997). This theory is inapplicable to the instant case because Ms. Taylor was simply an employee of the state working at TCF, and an employment relationship is consensual.

We, however, find that Plaintiff's complaint legally suffices to state a § 1983 claim premised on the "state-created danger" theory of liability. *DeShaney*, left open the possibility that the state may be liable for private acts which violate constitutionally protected rights despite the absence of a special relationship. In *DeShaney*, the Supreme Court stated that, "[w]hile the State may have been aware of the dangers that Joshua [DeShaney] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*" 489 U.S. at 201. (emphasis added). Several circuits, including this circuit, have cited this statement as support for recognizing a constitutional violation under a "state-created danger" theory of liability. *See, e.g., Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir.1998); *Mitchell v. Duval County Sch. Bd.*, 107 F.3d 837, 839 (11th Cir.1997); *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir.1996); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992) *Uhlrig v. Harder*, 64 F.3d 567, 572 n. 7 (10th Cir. 1995); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993); *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126, 126 L.Ed.2d 337 (1993); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990).

In this Circuit, we have recognized the possibility of using the "state-created danger" theory to hold a state or state actor liable under the Fourteenth Amendment for private acts of violence. *See, e.g., Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir.1993); *Gazette v. City of Pontiac*, 41 F.3d 1061, 10965 (6th Cir.1994); *Sargi*, 70 F.3d at 912–13; *Stemler*, 126 F.3d at 868. However, it was not until *Kallstrom* that we actually held a state actor liable for private acts of violence under the "state-created" danger theory. In *Kallstrom*, we held that the city's policy of freely releasing certain information[5] from undercover police officers' personnel files created a constitutionally cognizable "special danger" giving rise to liability under § 1983. *Kallstrom*, instructs that a plaintiff resting its § 1983 claim on a "state-created danger" theory of liability must demonstrate the following: (i) the plaintiff was a member of a limited and specifically defined group; (ii) the defendant's conduct put the plaintiff (and other members of the group) at substantial risk of immediate and proximate harm; (iii) the risk was known or obvious; and (iv) the defendant acted recklessly in conscious disregard of that risk. *Kallstrom*, 136 F.3d at 1066.

Here, applying the "state-created danger" theory to this case, the Plaintiff's complaint alleges facts which demonstrate that Ms. Taylor, as a food service steward at TCF, was a member of a limited and specifically definable group. The complaint also alleges facts that the Defendant's conduct (in promulgating, adopting or otherwise acquiescing to the offending TCF policies, practices and procedures contained in Plaintiff's complaint) put Ms. Taylor and the other members of that

---

**5.** Pursuant to the policy, the city freely released undercover police officers' addresses, phone numbers, drivers' licenses, the officers' families' names, addresses, and phone numbers to defense counsel for persons that these undercover officers were investigating.

group at substantial risk of serious, immediate and proximate harm. Furthermore, the Plaintiff's complaint alleges facts which demonstrate that the risks were known or obvious. Finally, the complaint contains factual allegations supporting a reasonable inference that the Defendant acted recklessly in conscious disregard of these risks.

### b. Dismissal On Grounds of Qualified Immunity

We review the district court's denial of qualified immunity *de novo. Risbridger v. Connelly,* 275 F.3d 565, 568 (6th Cir.2002). Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The defendant bears the burden of pleading the defense, but the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Wegener v. Covington,* 933 F.2d 390, 392 (6th Cir.1991). Here, the Plaintiff has failed to carry this burden.

■ We hold that the district court erred in concluding that the Defendant was not entitled to qualified immunity. In denying the Defendant's motion for qualified immunity the district court stated as follows:

In the absence of exigent circumstances, it is well settled that an executive official cannot act with deliberate indifference in the creation of policies and practices. Hence in the employment context, the defendant could neither punish Ms. Taylor by exposing her to an existing risk nor affirmatively create a new danger that made her more vulnerable to a harm. In this jurisdiction, the Constitution prevents an executive official from materially increasing the danger to which he renders other identifiable persons vulnerable.

The Court concludes that the rights which were allegedly violated by Trippett have been clearly established. Moreover, a reasonable responsible person, such as the warden in the case at bar, should have been aware of these basic standards. The precedential opinions in this area of law have frequently been discussed or have arisen in the context of prison management. *See, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 851–54, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (discussing varying standards controlling creation of prison policy and suppression of prison riots.) *See* J.A. at 112–13.

We conclude that the district court described the right that the Defendant allegedly violated too broadly. As the Supreme Court explained in *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the "clearly established" standard becomes meaningless if the relevant "legal rule" is defined in abstract or general terms. *Sheets v. Mullins,* 287 F.3d 581, 589 (6th Cir.2002). Instead, the relevant "legal rule" must be articulated in a particularized sense, such that the contours of the rule are sufficiently clear to put a reasonable official on notice that what he is doing is probably unlawful. *Sheets,* 287 F.3d at 589 (citing *Gable v. Lewis,* 201 F.3d 769, 771 (6th Cir.2000) (recognizing that the constitutional right asserted must be clearly estab-

lished in a particularized sense); *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986) (explaining that "[t]he words 'clearly established … constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms")).

Contrary to the district court's conclusion, we do not believe that the relevant "legal rule," here, the "state-created danger," was articulated in a particularized sense at the time of the Defendant's challenged conduct in May 1998. To be sure, in 1989 in *DeShaney*, the Supreme Court suggested, but did not hold, that state actors may be liable if they help create the danger that causes an individual's injury by a private party or if they render an individual more vulnerable to injury by a private party. The *DeShaney* Court did not specify how a state might create the danger causing an individual's injury, what actions of a state would render an individual more vulnerable to danger, or by how much the state must increase an individual's risk of injury from a third party before that individual's substantive due process rights are violated. Although it could be said that the state actors in *DeShaney* increased the risk that Joshua would be harmed by his abusive father, the Court, in fact, found no substantive due process violation under the particularized circumstances before it. Those circumstances involved state actors, faced with strong evidence of abuse, removing Joshua from the custody of his father, then returning Joshua to his father, then—despite continued evidence of abuse—failing to again remove Joshua from the father whose abuse ultimately killed him.

In this Circuit, until recently, the "state-created danger" theory, the relevant "legal rule" at issue, was not clearly established. Prior to 1998, although we had never held a state or state actor liable under the Fourteenth Amendment for private acts of violence, we nevertheless had recognized the possibility of doing so under the "state-created danger" theory. *See Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir.1993); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 912–13 (6th Cir.1995). In *Jones*, we concluded that the liability for private acts would lie only where the victim of such acts faced a special danger apart from the rest of society. 3 F.3d at 949. In *Gazette*, we indicated that courts are required by *DeShaney* to ask whether a state actor has rendered an individual more vulnerable to the danger he or she was already in. 41 F.3d 1061 at 1065. Like the Supreme Court in *DeShaney*, however, we rejected the plaintiff's substantive due process claim given the particularized circumstances before it—that is, where police officers not only failed to investigate reports of an abduction but also lied about their actions. Finally, in *Sargi*, we rejected the plaintiff's argument for liability premised on the "state-created danger" theory, because we determined that the plaintiff in that case failed to provide evidence that the defendant took any affirmative action that exposed the decedent to any danger to which she was not already exposed. 70 F.3d 907 at 913. Thus, in *Sargi*, we concluded that decedent's medical condition, not the defendants or its employees, created the decedent's peril; the defendants neither increased decedent's risk of harm nor rendered her more vulnerable to the injury she suffered. *Id.* Needless to say, in none of these cases did we specify what state action would have been necessary, hypothetically, to support the imposition of liability for a substantive due process violation in the non-custodial setting.

In *Kallstrom,* decided in February of 1998, we noted that no court within the Sixth Circuit had yet held the state or a state actor liable for private acts of violence under the "state-created danger" theory. 136 F.3d at 1066. Indeed, before *Kallstrom* was decided and probably during the period we presume that the defendant's conduct would have taken place, there was only one reported decision from a court within this circuit that had even allowed a private-act-of-violence case to survive a motion for summary judgment. *See Smith v. City of Elyria,* 857 F.Supp. 1203 (N.D.Ohio 1994). In *Smith,* the district court denied the city the defendant's motion for summary judgment because there was evidence that the victim's abusive ex-husband may have used the apparent authority given to him by police officers—who told him to remain in his ex-wife's home against her will—to facilitate the killing of his victim. Although we know the case survived a motion for summary judgment, we do not have the benefit of a reported decision to let us know how the case was ultimately resolved.

While each of these cases generally suggests that a state actor might be liable if he or she renders a victim more vulnerable to danger, not one of them convinces us that, in the period after *DeShaney* and before Ms. Taylor's death, the Defendant should have known that, by acting as he did, he would violate Ms. Taylor's substantive due process rights. Absent law that would have put the Defendant on notice that his particular conduct offended the Constitution, we find that he is entitled to qualified immunity.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order denying the Defendants' motion to dismiss for failure to state a claim and **REVERSE** the district court's order denying the Defendant's motion to dismiss on grounds of qualified immunity.